United States District Court
Southern District of Texas
**ENTERED**
August 31, 2018
David J. Bradley, Clerk

| | | |
|---|---|---|
| Ujwala Bhandari, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | Civil Action H-16-2265 |
| | § | |
| Maverick Tube Corporation, et al., | § | |
| | § | |
| Defendants. | § | |

## Opinion on Summary Judgment

1. *Background.*

Ujwala Bhandari served as the North American tax director at Maverick Tube Corporation from 2007 to August of 2015. Her job duties included coordinating transfer pricing, spotting tax risks related to Maverick's international operations, and making sure Maverick complied with tax laws. When she thought she found a tax risk, she would inform her supervisors. She reported to Fabian Lev, Tenaris's global tax director, and Christopher North, Maverick's chief financial officer.

Maverick, Hydril Company, Tenaris Global Services (U.S.A.) Corporation, and Tenaris Connections, Ltd., are wholly owned subsidiaries of Tenaris, S.A., which has headquarters in Argentina. Connections is in St. Vincent and the Grenadines. Maverick, Hydril, and Global are in the United States. Tenaris bought Hydril in 2007. Hydril is a subsidiary of Maverick, and it is included in Maverick's tax return.

By 2007, Hydril's primary business was threading seamless pipe with its technology. Its technology is a patented range of threads for joints and couplings that are used to link casing and tubing, among other products, in high-pressure or high-temperature environments. These may be in deep-water offshore wells, deep gas wells, and horizontal wells. Tenaris manufactures pipe used in high-

pressure applications and in other settings such as in offshore or onshore pipelines.

Hydril primarily threaded pipe made by other Tenaris companies, but it also licensed its technology.

A.  *The Transaction.*

In 2010, Hydril gave Connections a ten-year, non-exclusive right to sublicense its technology in the market outside of the North-American Free Trade Agreement. Hydril had already licensed its technology to customers in Mexico, United States, and Canada. Connections paid Hydril $22.5 million in a lump sum.

The price Connections paid was based on its continuing to charge companies the same royalty that Hydril charged. In 2010, Hydril charged companies a royalty of 10% of the price of threading pipe. The sublicense was valued at what Hydril could expect to earn if it continued to license its technology at this royalty rate.

B.  *Pricing.*

Because the sublicense is between two related companies, the United States company must include a transfer pricing report in its tax return. A transfer pricing report ensures that the price paid by a related party is roughly what an unrelated third party would have paid. This requires the object of exchange to be valued. The value of a license may be calculated by determining the projected income that the licensor would earn if it continued to charge the same royalty rate for the duration of the agreement. If the Internal Revenue Service reviews a company's pricing report and thinks that the deal did not use an approximation of the market value, it may adjust the company's tax liability to reflect the actual income earned.

In 2010, Hydril asked Duff & Phelps, an outside advisor, to value the sublicense. Duff & Phelps used Hydril's past royalty rate to value the sublicense. In the past, Hydril had charged companies a 10% royalty rate on the cost to

thread pipe with its technology. Using this rate, Duff predicted the sublicense to be presently worth $22.5 million. This amount reflects the formula:

Valuation = Present value of the projected royalty revenue earned by Connections *minus* Cost saved *plus* reversion right offset

Duff estimated the present value of what Connections could earn over ten years charging the same royalty as Hydril to be $30.9 million. Duff estimated that Hydril saved $3.3 million by having Connections administer the license. Duff estimated the reversion-right offset to be $5.1 million. The reversion-right offset reflects how much Connections's use and marketing add to the value of Hydril's technology.

In 2012, Maverick retained Ernst & Young to prepare its 2012 transfer pricing report, which it also calculated at the 10% rate.

C. *The Change.*

In 2014, Connections changed its royalty rate structure. Connections charged a 6% royalty rate calculated on the price of pipe plus the cost to thread it. Despite being a smaller percentage, Connections earned more money. Hydril continued to charge its 10% royalty rate to its North American customers while Connections charged the 6% rate to its other customers.

Bhandari argues that the change in the royalty structure affected the sublicense's value, resulting in Maverick's under-reporting its tax liability. The difference between the projected revenue in the Duff & Phelps 2010 valuation and the actual revenue Connection earned is:

| Year | Projected millions of dollars | Actual millions of dollars |
|------|-------------------------------|----------------------------|
| 2012 | 4.7 | 12.5 |
| 2013 | 4.8 | 17.7 |
| 2014 | 4.9 | 27.6 |

Bhandari used the differences in actual income received to highlight how much more money Connections earned under the new structure. After it increased the royalty rate, Tenaris also internally updated the sublicense valuation. It increased the present value of the projected 10-year royalty revenue from $30.9 million to $115.5 million. Whether Maverick needed to presently update the reversion rights offset is disputed.

Bhandari says that Maverick misled the Service by under-reporting its taxable income. Without increasing the offset, the sublicense would be worth more than what Connections paid. She does not think the offset should be increased because the increased revenue is due to the pipe, not Connections's marketing.

Although she thinks the difference between actual and projected revenue indicates Maverick's misbehavior, Bhandari gives another possible reason for the difference – the price of oil increased worldwide. More drilling meant more sales of Tenaris's threaded pipe, which meant more revenue.

It does not matter whether the transfer pricing report was updated in 2014. Maverick self-reported Bhandari's allegations to the IRS by giving it the letter that her counsel sent Maverick. Maverick met with the Service to discuss the letter. It requested the opinions Maverick had from its advisors – Ernst & Young, Deloitte, and Sullivan & Cromwell. Sullivan & Cromwell's opinion said that Maverick's conclusions on its tax return were "consistent with [its] view on the tax treatment of these [transfer pricing report] issues." The Service made no further requests relating to Bhandari's complaint. On March 1, 2016, it told Maverick that it had completed the audit of its 2012 tax return without changes made by the Service or Maverick.

2. *The Claim.*

In May 2015, the Service initiated an audit of Maverick's 2012 tax return. Maverick was scheduled to meet with it on August 13, 2015, to discuss the 2012 pricing report. This did not happen. In a conference that Bhandari secretly recorded, she told her supervisors that she would not stick to the meeting agenda to only discuss the 2012 tax return. She said she could not present it "as is"

without also telling the Service about the increased royalty rates. Bhandari claims that her protected activity was her telling her supervisors that Maverick underreported its tax liability and that she could not present the 2012 tax return "as is." She argues this is protected because Maverick's potential tax exposure was material, so it should have been included on Maverick's books and public financials statements. She also says that Maverick violated its own internal controls. Maverick decided to fire her in February 2015. On August 14, 2015, it fired her – one day after the scheduled IRS meeting.

She filed a charge with the Equal Employment Opportunity Commission and did not receive a response in 180 days. She claims that Maverick retaliated against her as a whistle blower because (a) she engaged in a protected activity, and (b) these actions contributed to Maverick's decision to fire her.

### A. *Protected Activity.*

Bhandari claims that her actions are protected because (a) her conduct is within the scope of the Sarbanes-Oxley Act, and (b) her belief that Maverick was acting illegally was objectively reasonable. She also argues that performing her job duties and reporting wrongful conduct to the wrongdoers might be protected by the statute. Someone charged with identifying tax risks and who lawfully reports such risks to her supervisors might be protected if she reasonably believes that the company behaved illegally.[1]

It was not reasonable for someone like Bhandari to think Maverick broke the law by not adjusting its transfer pricing report. Actions by Maverick in 2014 do not change the value of the sublicense in 2012.

While she takes issue with Maverick's not changing its transfer pricing report in the years after Tenaris changed the royalty, a regional tax director should know that pricing reports are not adjusted on a year-by-year basis. Because transfer pricing reports are changed using multi-year averages, she would have expanded the agenda to the 2015 meeting on the 2012 return had

---

[1] 18 U.S.C. 1514A(a)(1).

she brought it to the Service's attention. No one would have been prepared to discuss it. She was not reporting wrongdoing – only a fact about something else.

The Service reviewed Bhandari's complaint, talked to Maverick about it, and did not change Maverick's tax liability for 2012. Sullivan & Cromwell said Maverick's 2012 tax return was reasonable.

Between 2007 and 2015, Bhandari worked on major projects, including the merger and restructuring of Maverick. She has an undergraduate degree in accounting, a master's degree in business, a master's degree in tax, and has worked for several years with large, public companies, including ExxonMobil. She should have known that what she saw was not a problem because pricing reports are not adjusted on a year-by-year basis and because a change in 2014 would not have affected 2012. The law allows her to be mistaken in her belief, but it does not protect unreasonable beliefs or talking about whatever she wants in a meeting.[2]

In essence, she says it was illegal to wait until the time for receiving the reversion valuations to decide the amount reported. It is not reasonable for someone with her background to think Maverick tried to defraud the United States government by underpaying its tax liability on these facts. Her supervisor told her that it was improper for Connections to charge Tenaris-related parties in different market areas different royalty rates. This, however, does not change the fact that transfer pricing reports are not updated yearly. For the 2012 tax return, it was unreasonable for her to insist that a change in royalty rate two years later would immediately affect that tax return. It was unreasonable for her to think the pricing report needed to be changed the same year the royalty rate changed.

Also, Bhandari was supposed to be figuring out the effect of the change in the royalty rate. Not only was that part of her job, but also Lev specifically asked her to do it. Instead of analyzing the problem, Bhandari accused the company of under-reporting its tax liability. Lev had asked her to look at the change in royalty rate in March of 2014. In January of 2015, she said that it

---

[2] 18 U.S.C. 1514A(a)(1).

needed to be examined – she had not done it. After dragging her feet on the work she was supposed to be doing, she admitted that she did not have the facts to support her accusations. Then she blamed others for not giving her the facts.

    B.    *Contributing Factor.*

Maverick would have fired her regardless of whether she had told her bosses that the company was going to under-report its taxes.

She says that what she did contributed to Maverick's decision to fire her. She says her name did not appear on Maverick's list of potential employees to fire until after she (a) first received Connections's royalties revenue between 2010 and 2014, (b) told North and Tenaris's tax compliance regional manager that based on what she saw, Maverick's tax liability was significant, and (c) requested more information to help her understand the effect of Tenaris's changing royalty rates.

She thinks that her actions are why she was considered for termination. She says that Maverick's decision not to fire her on March 30, 2015, is suspicious. Bhandari questions why Maverick would call her to the meeting of August 13, 2015, charge her with presenting the 2012 tax return, and fire her the day after she said she refused to only speak about what the Service wanted to know. Refusing a direct, legal order is a significant insubordination.

Bhandari was one of 752 employees laid off between 2015 and 2016. Maverick laid off workers in all sectors of its Houston division. During the meeting when her name came up as an employee Maverick could lay off, the company decided it would also lay off three people from accounts payable, a cost accountant, and one person in the treasury department. Her position made her a candidate to be fired in a reduction of force. Maverick no longer needed someone of her skill level and pay rate to do what it needed done. Bhandari's services were needed when Maverick was expanding, but Maverick did not expect to expand in the near term. Bhandari finds it significant that Maverick posted a job opening for a position with similar duties after she was fired. This job posting was for a job of similar work but lower rank. Her responsibilities could be handled by someone of lower rank and lower pay.

Bhandari misinterprets why Maverick continued to employ her until August 2015. It wanted to get as much information from her as it could. Maverick continued to operate as usual until it fired her. She was involved in preparing the 2012 tax return. It made sense for Maverick to want her, its North American tax director, to present its 2012 tax return to the Service. That the day she was fired was one day after the day of the presentation does not prove causation. Maverick had decided that she would be laid off several months earlier.

She pretends that she was mistreated because Maverick was hiding its inter-company pricing; however, Maverick sent her letter to the Service voluntarily.

3. *Conspiracy and Joint Enterprise.*

Without a violation of the Sarbanes-Oxley Act, Bhandari cannot have a conspiracy or joint enterprise claim.

4. *Conclusion.*

Ujwala Bhandari will take nothing from Maverick Tube Corporation, Hydril Company, and Tenaris Global Services (U.S.A.) Corporation.

Signed on August 31, 2018, at Houston, Texas.

Lynn N. Hughes
United States District Judge